In re Timothy R. EUBANKS and
Tonya J. Eubanks, Debtors.

FIRST UNION MORTGAGE
CORPORATION,
Appellant,

v.

Timothy R. EUBANKS and Tonya
J. Eubanks, Appellees.

BAP Nos. 97–8078, 97–8084.

United States Bankruptcy Appellate Panel
of the Sixth Circuit.

Argued Feb. 4, 1998.

Decided May 12, 1998.

---

John F. Cannizzaro, Cannizzaro, Frasier & Bridges, Marysville, OH, for Appellees.

J. Micahel Debbeler, Catherine L. Evans, Lerner, Sampson and Rothfuss, Cincinnati, OH, for Appellant.

Before: BAXTER, LUNDIN, and STOSBERG, Bankruptcy Appellate Panel Judges.

## OPINION

First Union Mortgage Corporation appeals the bankruptcy court's orders overruling objections and confirming the Debtors' Chapter 13 plan. The bankruptcy court held that the 1994 enactment of 11 U.S.C. § 1322(c)(2) created an exception to the protection from modification in § 1322(b)(2) that permitted a Chapter 13 plan to bifurcate an undersecured "short term" mortgage on the debtors' principal residence. We affirm.

## I. ISSUE ON APPEAL

Whether 11 U.S.C. § 1322(c)(2) permits bifurcation of an undersecured mortgage on a Chapter 13 debtor's principle residence when the last payment on the original payment schedule is due before the final payment under the plan.

## II. JURISDICTION AND STANDARD OF REVIEW

The United States District Court for the Southern District of Ohio authorized appeals to the Bankruptcy Appellate Panel of the Sixth Circuit. The order confirming this Chapter 13 plan was a final order for purposes of appeal to the BAP. *See Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474 (6th Cir.1992).

The appeal presents only a legal question. A bankruptcy court's conclusions of law are reviewed de novo. *See, e.g., National City Bank v. Elliott (In re Elliott)*, 214 B.R. 148 (6th Cir. BAP 1997) (citations omitted). De novo review requires the Panel to review questions of law independent of the bankruptcy court's determination. *In re Schaffrath*, 214 B.R. 153, 154 (6th Cir. BAP 1997) (citation omitted). The facts of this case are not disputed.

## III. FACTS

On July 6, 1995, the Debtors, Timothy and Tonya Eubanks, executed a $16,400 note in favor of First Union Home Equity Bank, N.A. The Note is secured by a second mortgage on the Debtors' principal residence. The Note requires 60 monthly payments and will mature on July 11, 2000. The first mortgage is held by Waterfield Mortgage Company.

The Debtors filed Chapter 13 on October 16, 1996. First Union filed a proof of claim for $14,526.13. Waterfield filed a proof of claim for its first mortgage for $34,973.61. These two encumbrances total $49,499.74. The appraised value of the Debtors' residence is $45,000. First Union is undersecured by approximately $4,500.[1]

The Debtors proposed a Chapter 13 plan that bifurcated First Union's claim into its allowable secured and unsecured components in accordance with 11 U.S.C. § 506(a).[2] First Union's allowed secured claim (approximately $10,000) would be paid in full with interest pursuant to § 1325(a)(5) under the

---

1. The dissent questions the Debtors' proposal to save a home that holds no equity. *See ante* at 480. The Bankruptcy Code does not require that a debtor have value in excess of liens to confirm a Chapter 13 plan. These Debtors propose to pay the present value of First Union's allowable secured claim in order to save possession and use of their home. Chapter 13 debtors rarely have equity in the personal or real property they manage through confirmed plans.

2. Section 506(a) provides in part:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. . . .

11 U.S.C. § 506(a).

Debtors' plan. Its unsecured claim (approximately $4,500) would receive the 10% dividend provided for all unsecured claimholders.

First Union objected to confirmation on the ground that bifurcation of its claim was a modification prohibited by § 1322(b)(2). First Union conceded that its claim was the type of "short term" mortgage addressed by the 1994 enactment of § 1322(c)(2); but argued that § 1322(c)(2) created only a limited exception to the anti-modification protection of home mortgages in § 1322(b)(2), allowing the curing of defaults on "short term" mortgages, but not bifurcation.

The bankruptcy court overruled First Union's objection to confirmation, adopting the well-reasoned analysis of *In re Young*, 199 B.R. 643 (Bankr.E.D.Tenn.1996). The bankruptcy court held that § 1322(c)(2) creates an exception to the protection from modification in § 1322(b)(2) and authorizes "claim splitting" with respect to the discrete group of home mortgages described in the new subsection. *In re Eubanks*, No. 96–57615 (Bankr.S.D.Ohio July 3, 1997). The bankruptcy court confirmed the Debtors' plan. First Union appealed.

## IV. DISCUSSION

Enacted as part of the Bankruptcy Reform Act of 1994, 11 U.S.C. § 1322(c)(2) provides:

(c) *Notwithstanding subsection (b)(2)* and applicable nonbankruptcy law—

. . . .

(2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, *the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.*

Pub.L. No. 103–393, 108 Stat. 4106, § 301 (Oct. 22, 1994) (emphasis added) (codified at 11 U.S.C. § 1322(c)(2)).

New § 1322(c)(2) is a statutory exception to the protection from modification afforded most home mortgage lenders in Chapter 13 cases by § 1322(b)(2). The introductory phrase, "[n]otwithstanding subsection (b)(2)," "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18, 113 S.Ct. 1898, 1903, 123 L.Ed.2d 572 (1993) (citing *Shomberg v. United States*, 348 U.S. 540, 547–48, 75 S.Ct. 509, 512–13, 99 L.Ed. 624 (1955)). Interpreting identical "notwithstanding" language in § 1322(b)(5), the Supreme Court acknowledged that these words create a "statutory limitation[ ]" on the rights of mortgage holders in Chapter 13 cases. *Nobelman v. American Savings Bank*, 508 U.S. 324, 331, 113 S.Ct. 2106, 2110, 124 L.Ed.2d 228 (1993). *See also In re Bagne*, 219 B.R. 272, 276 (Bankr.E.D.Cal. 1998) ("Section 1322(b)(5) provides an exception to [§ 1322(b)(2)]. . . . Another exception . . . is found in § 1322(c)(2). . . . Plainly, this language ['notwithstanding subsection [1322](b)(2)'] instructs the court to disregard § 1322(b)(2).").

Section 1322(b)(2), the subsection to which § 1322(c)(2) is an exception, provides:

(b) Subject to subsections (a) and (c) of this section, the plan may—

. . . .

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims. . . .

11 U.S.C. § 1322(b)(2).

In Chapter 13 cases, § 1322(b) grants debtors broad power to modify the rights of the holders of secured claims. Section 1322(b)(2) then creates an exception to that broad power of modification for claims "secured only by a security interest in real property that is the debtor's principal residence." Section 1322(c)(2) now creates an "exception to the exception" for the subset of real property secured claims "in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the

debtor's principal residence is due before the date on which the final payment under the plan is due." 11 U.S.C. § 1322(c)(2). In other words, in 1994 Congress abrogated the protection of home mortgages from modification in Chapter 13 cases to the extent, and with respect to, the real estate secured claims described in new § 1322(c)(2).

First Union must concede that its claim falls within the class of mortgages that § 1322(c)(2) subjects to modification in Chapter 13 cases. Its argument that "bifurcation" is not a modification permitted by § 1322(c)(2) tortures the words used by Congress, makes a mess of several other well-settled provisions of the Code and trumps the plain language of the statute with the ambiguous silence of legislative history.

## A. Plain Meaning.

■ "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (alteration in original) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)).

With respect to First Union's second mortgage, § 1322(c)(2) authorizes the Debtors' plan to "provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title." 11 U.S.C. § 1322(c)(2). Section 1325(a)(5) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . . .

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder. . . .

11 U.S.C. § 1325(a)(5).

The "allowed secured claim" of which § 1325(a)(5) speaks is derived through valuation and "bifurcation" in accordance with § 506(a). As the Supreme Court explained, "Section 506 . . . governs the definition and treatment of secured claims, . . . [and] provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured." *Ron Pair*, 489 U.S. at 238–39, 109 S.Ct. at 1029 (footnotes omitted). The Supreme Court has recognized that undersecured claims are split by § 506(a) and then can be "crammed down" in a Chapter 13 case by § 1325(a)(5):

Under the cramdown option [of § 1325(a)(5)(B) ], the debtor is permitted to keep the property over the objection of the creditor, [provided] the creditor retains the lien securing the claim, [citation omitted], and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, *i.e.*, the present value of the collateral, [citation omitted]. The value of the allowed secured claim is governed by § 506(a) of the Code.

*Associates Commercial Corp. v. Rash*, —— U.S. ——, —— – ——, 117 S.Ct. 1879, 1882–83, 138 L.Ed.2d 148 (1997). *Accord United States v. Arnold*, 878 F.2d 925, 928 (6th Cir.1989) ("Under this section [1325(a)(5) ], the debtor can 'cramdown' a plan repaying 'only the allowed secured claim,' *i.e.*, the amount of the debt to the extent it is secured by the present value of collateral taken by the creditor."); *Young*, 199 B.R. at 647 ("The very essence of a § 1325(a)(5) modification is the write down or 'cramdown' of a secured claim to the value of the collateral securing the debt.").

Section 1322(c)(2) incorporates § 1325(a)(5) to define the new power to modify real estate secured claims within its reach. *See Bagne*, 219 B.R. at 277. The plain meaning of the phrase "provide for payment of the claim as modified pursuant to

section 1325(a)(5)" includes that undersecured claims will be valued, bifurcated and crammed down consistent with well-settled interpretations of § 1325(a)(5).

First Union cites *Witt v. United Companies Lending Corporation (In re Witt)*, 113 F.3d 508 (4th Cir.1997), for a different reading of § 1322(c)(2). In *Witt*, the Fourth Circuit held that § 1322(c)(2) allows Chapter 13 plans to modify the dollar amount of the "payments" on a mortgage claim that falls within the new section, but prohibits other modifications of the "claim." To reach this result, *Witt* found ambiguity in § 1322(c)(2). *Id.* at 511. The Fourth Circuit isolated the first six words of the phrase *"payment of the claim as modified* pursuant to section 1325(a)(5) . . . ." This subphrase, the court found, can be read to allow modification of either "claim" or "payment." *Id.*

■ To resolve this "ambiguity," the court considered but rejected the doctrine of the last antecedent. Under this doctrine, "a phrase should be read to modify its immediate antecedent." *Id.* Applied to § 1322(c)(2), "as modified" would relate to "claim," its immediate antecedent, and would allow modification (such as bifurcation) of claims within its reach. This reading, although " 'quite sensible as a matter of grammar,' . . . '[was] not compelled.' " *Id.* (quoting *Nobelman*, 508 U.S. at 330, 113 S.Ct. at 2111). The Fourth Circuit reasoned:

> [T]he term "claim" is part of the phrase "of the claim," which modifies "payment." It is quite plausible as a matter of common sense, we believe, that the phrase "as modified" also modifies "payment" and not "claim." After all, the subject of payment is the focus of § 1322(c)(2); it only deals with plan payment provisions when "the last payment on the original payment scheduled" on a home mortgage loan "is due before the date on which the final payment under the plan is due."

*Id.*

The *Witt* court sought support for this reading in the legislative history of § 1322(c)(2). The legislative history states that § 1322(c)(2) was intended to overrule *First National Fidelity Corp. v. Perry*, 945 F.2d 61 (3d Cir.1991). *Witt*, 113 F.3d at 512 (citation omitted). In *Perry*, the Third Circuit held that entry of a prepetition foreclosure judgment cut off a Chapter 13 debtor's power to cure defaults through a plan because the mortgagee was entitled to immediate payment in full, and the protection from modification in § 1322(b)(2) prohibited any treatment other than immediate payment in full. *Perry*, 945 F.2d at 65–6. From the reference to *Perry* in the legislative history, the *Witt* court concluded, "§ 1322(c)(2) was only intended to allow payments to be stretched out over time; the debtor is still required to pay the 'full amount of the *allowed secured claim.*' " *Witt*, 113 F.3d at 512 (footnote and citation omitted) (emphasis added).

The Fourth Circuit also was encouraged by the absence of discussion of *Nobelman* in the legislative history of § 1322(c)(2). The *Witt* court characterized bifurcation of claims excepted from the protection of § 1322(b)(2) by § 1322(c)(2) as "directly overrul[ing]" *Nobelman*—an interpretation to be avoided because there is no statement of intent to overrule *Nobelman* in the 1994 legislative history. *Id.* at 513.

Lastly, the Fourth Circuit observed that its result was supported by the Congressional intent behind § 1322(b)(2): to encourage the flow of capital into the home financing market. *Id.* at 514.

After careful consideration of the Fourth Circuit's analysis, the Panel concludes that if there are two plausible interpretations of the phrase "payment of the claim as modified" in § 1322(c)(2), the choice between the two readings is resolved by the words Congress used to complete the phrase: "payment of the claim as modified *pursuant to section 1325(a)(5)* . . . ."

As demonstrated above, § 1325(a)(5) has always dealt only with the treatment of "allowed secured claims" in Chapter 13 cases. It has consistently been interpreted by the Supreme Court to include the use of § 506(a) to split undersecured claims into secured and unsecured components, and to permit "cram down" after bifurcation. *See Rash*, —— U.S. at —— – ——, 117 S.Ct. at 1882–83 (quoted

above). It is appropriate to assume that Congress knew in 1994 that the Supreme Court had interpreted § 1325(a)(5) to include bifurcation and that Congress intended § 1325(a)(5) to have the same meaning in § 1322(c)(2) as elsewhere in the Code.[3] The cross reference to § 1325(a)(5) in § 1322(c)(2) is an unequivocal statement of congressional intent that Chapter 13 debtors are empowered by § 1322(c)(2) to bifurcate the special real estate secured claims that this new section excepts from the modification protection in § 1322(b)(2). Other courts agree that the "plain meaning" of all the words in § 1322(c)(2) requires the ordinary application of claim splitting under §§ 1325(a)(5) and 506(a) with respect to the special class of mortgages described in the new subsection. *See In re Mattson*, 210 B.R. 157, 160 (Bankr.D.Minn.1997); *Young*, 199 B.R. at 653. See also *Bagne*, 219 B.R. at 276–77.

■ The *Witt* court's reading of § 1322(c)(2) makes nonsense of the cross reference to § 1325(a)(5) in other ways. For example, surrender of collateral is one option under § 1325(a)(5). Section 1325(a)(5)(C) permits a Chapter 13 debtor to satisfy an "allowed secured claim" by surrendering the property securing the claim. After disposition of the surrendered collateral, an undersecured creditor may only assert the deficiency as a general unsecured claim. *See In re White*, 169 B.R. 526, 529 (Bankr.W.D.N.Y. 1994) ("The debtor could alternatively surrender the collateral to the secured creditor in full satisfaction of the creditor's 'secured' claim, relegating the creditor only to 'unse-

cured' status as to any deficiency, [citation omitted.]"). This is true for all recourse, undersecured claims that are not protected from modification in Chapter 13 cases. *See* 11 U.S.C. § 1325(a)(5); *Rash*, —— U.S. at ——–——, 117 S.Ct. at 1882–83 (quoted above).

If the cross reference to § 1325(a)(5) in § 1322(c)(2) permits "payment modification" but not claim splitting, surrender of all collateral securing a claim of the sort described in § 1322(c)(2) leaves an unsecured debt that must be paid in full *with interest* to confirm a plan—possibly the most exalted status ever achieved by a nonpriority, unsecured claim under the Bankruptcy Code. This result is akin to, yet exceeds, the § 1111(b) election available to undersecured creditors in Chapter 11 cases.[4] There is no inkling in the language of new § 1322(c)(2) that an automatic § 1111(b)(2)-like treatment of "short term" mortgages was contemplated by Congress in Chapter 13 cases. If anything, just the opposite appears—Congress intended in 1994 to provide less favored treatment for "short term" mortgages in Chapter 13 cases by excepting such mortgages from the modification protection in § 1322(b)(2).

## B. Legislative History.

■ " 'If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.' " *Reves v. Ernst & Young*, 507 U.S. 170, 177, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993) (quoting *United States v.*

3. *See Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."); *see also Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law.... [I]t is not only appropriate but also realistic to presume that Congress was thoroughly familiar with these unusually important precedents from this and other federal courts and that it expected its enactment to be interpreted in conformity with them.").

4. Under § 1111(b)(2) an undersecured creditor in a Chapter 11 case may elect to be treated "as if" its claim was fully secured, notwithstanding § 506(a). 11 U.S.C. § 1111(b)(2) ("If such an election is made, *then notwithstanding section 506(a) of this title*, such claim is a secured claim to the extent that such claim is allowed.") (emphasis added). This outcome was considered by Congress to be so extraordinary that it required one of the most complicated (and controversial) provisions of Chapter 11 of the 1978 code—the § 1111(b) election. *See generally* Margaret Howard, *Secured Claims in Bankruptcy: An Essay on Missing the Point*, 23 Cap. U.L.Rev. 313 (1994); Theodore Eisenberg, *The Undersecured Creditor in Reorganizations and the Nature of Security*, 38 Vand. L. Rev. 931 (1985).

*Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980))). Resort to legislative history is not necessary to understand § 1322(c)(2). However, we have looked at the legislative history to measure First Union's arguments and to consider the *Witt* court's use of that history. There is support for our reading of § 1322(c)(2) in the legislative history.

The Bankruptcy Reform Act of 1994 was known in Congress as H.R. 5116. *See* Pub.L. No. 103–393, 108 Stat. 4106 (Oct. 22, 1994). H.R. 5116 was the fourth bill addressed to bankruptcy reform after 1991. Its evolution began with the introduction in the Senate of S.1985 on November 10, 1991. S.1985 offered two amendments to § 1322. The first would have amended § 1322(b)(2), striking "claims;" and inserting:

> claims, but the plan may not modify a claim pursuant to section 506 of a person holding a primary or a junior security interest in real property or a manufactured home ... that is the debtor's principal residence, except that the plan may modify the claim of a person holding such a junior security interest that was undersecured at the time the interest attached to the extent that the interest remains undersecured;

S. 1985, § 310 ("Contents of Plan"). The Committee Report explained:

> This section is designed to clarify the Bankruptcy Code and congressional intent on the problem which is often referred to as "cramdowns" or "lien stripping".... This section is designed to protect the entire claim in the case of first mortgages, not only that portion of the claim which would be secured pursuant to the status provided by section 506 of the code. This section would prohibit such cramdowns in cases of primary mortgages on residential real estate that is the debtor's principal residence, and would prohibit a cramdown on a junior mortgage, except where the security interest was undersecured at the time the security interest attached. This clarification of current law seeks to enhance the protection for first mortgages,

and recognizes that some secondary mortgages deserve such protection. However, this section implicitly recognizes that a court does have authority under section 506 of the code to modify a secondary security interest[ ] in residential real estate under certain circumstances, notwithstanding section 1322(b)(2).

S. Rep. No. 279, 102d Cong., 2d Sess. 40–1 (1992).

The second amendment to § 1322 proposed to redesignate subsection (c), subsection (d), and to add new subsection (c):

> (c) Notwithstanding State law and subsection (b)(2), and whether or not a claim is matured or reduced to judgment, a debtor who at the time of filing a petition under this title possesses any legal or equitable interest, including a right of redemption, in real property securing a claim–
>
> (1) may cure a default and maintain payments on the claim pursuant to subsection (b)(3) or (5); or
>
> (B) [sic] in a case in which the last payment on the original payment schedule for the claim is due before the date on which the final payment under the plan is due, may provide for the payment of the claim pursuant to section 1325(a)(5).

S.1985, § 313 ("Plan Contents"). The purpose of this amendment was explained in the Committee Report:

> This section clarifies that chapter 13 is to be construed, in accord with previously determined congressional intent, that debtors should be given full opportunity to pay their foreclosure debts, to cure their defaults and reinstate their mortgage payments, and to retain their homes. This section clarifies that Federal bankruptcy rights provided in sections 1322 and 1325 preempt any State laws in conflict with Federal law.... This provision overturns cases such as *In Re Roach,* 824 F.2d 1370 (3d Cir.1987), and *First National Fidelity Corp. v. Perry,* 945 F.2d 61 (3d Cir.1991), because *Roach* and *Perry* wrongfully elevated State law to cut off Federal bankruptcy rights. This clarification is accomplished by explicitly recognizing such

rights and the ability to cure a default pursuant to subsection 1322(b)(3) and (5) of the Bankruptcy Code.

S. Rep. No. 279, 102d Cong., 2d Sess. 41–2 (1992).

A companion bill, H.R. 6020, offered in the House of Representatives on September 24, 1992, also proposed two amendments to § 1322. Section 202 of H.R. 6020 would have amended § 1322(b)(2), striking out "other than a claim secured only by a security interest in real property that is the debtor's principal residence," and substituting:

except that the rights of the holder of a claim secured only by the most senior security interest in real property that is the debtor's principal residence may not be modified to reduce the secured claim to a value that is less than the value, as of the date the security interest arose, of the creditor's interest in the estate's interest in such property.

H.R. 6020, § 202 (1992). The Committee Report stated that this amendment was to "specify that senior mortgage liens may not be bifurcated under Section 506 to the extent they were not undersecured when they were originated." H.R.Rep. No. 996, 102d Cong., 2d Sess. 22 (1992).

Section 201 of H.R. 6020, entitled "Period for Curing Default Relating to Principal Residence," proposed a new subsection (c):

(c) A default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b), notwithstanding applicable nonbankruptcy law, until such residence is sold under such lien and in accordance with applicable nonbankruptcy law.

H.R. 6020, § 201. The Committee Report explained that this amendment was to overrule the results of the Third Circuit's decisions in *Roach* and, combined with section 202 of H.R. 6020, *Perry*. The "Committee believe[d] [the *Roach*] decision [was] in conflict with the fundamental bankruptcy principal allowing the debtor a fresh start through bankruptcy." H.R.Rep. No. 996, 102d Cong., 2d Sess. 21 (1992). The Report continued:

This section of the bill safeguards a debtor's rights in a chapter 13 case by allowing the debtor to cure its home mortgage defaults at least through the time of foreclosure sale under applicable non-bankruptcy law. However, if the State provides the debtor more extensive "cure" rights ..., the debtor would continue to enjoy such rights in bankruptcy. The changes made by this section, in conjunction with those made in section 202 of H.R. 6020, would also overrule the result in [*Perry*]. In that case, the Third Circuit held that subsequent to foreclosure judgment, a chapter 13 debtor cannot repay its mortgage debt in full over the life of the plan, because doing so would constitute an impermissible modification of the mortgage holder's right to immediate repayment under section 1322(b)(2) of the Bankruptcy Code.

*Id.*

Neither S.1985 nor H.R. 6020 advanced beyond their respective chambers, and on March 10, 1993, S. 540 was introduced in the Senate. S. 540 was substantially similar to S.1985, and offered identical amendments to § 1322. S. 540, §§ 301 (added new subsection (c)) & 306 (proposed amendment of subsection (b) limiting cramdowns). Section 301 of S. 540, which introduced new subsection (c), was, however, newly entitled "Period of Curing Default Relating to Principal Residence."

The Committee Report on S. 540 was issued after the Supreme Court's decision in *Nobelman*. The section analysis for § 301 of S. 540 was nearly identical to that in the Committee Report for the preceding Senate bill, S.1985. The impact of *Nobelman* was noted in the Report with respect to § 306 of the bill which addressed cramdowns:

When this section was initially offered, caselaw was unsettled regarding the ability of a bankruptcy court to make a cramdown. Since then, the U.S. Supreme Court, in [*Nobelman*] ..., has held that section 1322(b)(2) prohibits a chapter 13 debtor from relying on section 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence. This section confirms

protection from cramdowns for first mortgages and for secondary mortgages that deserve such protection. However, this section would provide that a court does have authority to modify secondary security interests in residential real estate under certain circumstances.

S. Rep. No. 168, 103d Cong., 1st Sess. 52 (1993).

H.R. 5116, the companion bill to S. 540, was introduced in the House of Representatives on September 28, 1994. H.R. 5116 also offered two amendments to § 1322. The bill proposed the addition of (e) to § 1322 to overrule the Supreme Court's decision in *Rake v. Wade,* 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). *See* H.R. 6020, § 305(c); H.R.Rep. No. 835, 103d Cong., 2d Sess. 55 (1994). Secondly, § 301 of H.R. 5116 introduced new subsection (c) to § 1322:

> (c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—
>
> > (1) a default with respect to, or that gave rise to, a lien on the debtors [sic] principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law; and
> >
> > (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtors [sic] residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to 1325(a)(5) ....

H.R. 5116, § 301. The Committee Report's section analysis of § 301 of H.R. 5116 explained:

> Section 1322(b)(3) and (5) of the Bankruptcy Code permit a debtor to cure defaults in connection with a chapter 13 plan, including defaults on a home mortgage loan. Until the Third Circuit's decision in *Matter of Roach,* 824 F.2d 1370 (3d Cir. 1987), all the Federal Circuit Courts of Appeal had held that such right continues at least up until the time of the foreclosure

sale. The *Roach* case, however, held that the [debtor's] right to cure was extinguished at the time of the foreclosure judgment, which occurs in advance of the foreclosure sale. This decision is in conflict with the fundamental bankruptcy principle allowing the debtor a fresh start through bankruptcy.

> This section of the bill safeguards a debtor's rights in a chapter 13 case by allowing the debtor to cure home mortgage defaults at least through completion of a foreclosure sale under applicable nonbankruptcy law. However, if the State provides the debtor more extensive "cure" rights ..., the debtor would continue to enjoy such rights in bankruptcy. The changes made by this section, in conjunction with those made in section 305 of this bill, would also overrule the result in *First National Fidelity Corp. v. Perry,* 945 F.2d 61 (3d Cir.1991) with respect to mortgages on which the last payment on the original payment schedule is due before the date on which the final payment under the plan is due. In that case, the Third Circuit held that subsequent to foreclosure judgment, a chapter 13 debtor cannot provide for a mortgage debt by paying the full amount of the allowed secured claim in accordance with Bankruptcy Code section 1325(a)(5), because doing so would constitute an impermissible modification of the mortgage holder's right to immediate payment under section 1322(b)(2) of the Bankruptcy Code.

H.R.Rep. No. 835, 103d Cong., 2d Sess. 52 (1994) (footnote omitted). H.R. 5116 was passed, without amendment, by the House on October 5, 1994, by the Senate on October 6, 1994, and signed into law on October 22, 1994. Bankruptcy Reform Act of 1994, Pub.L. No. 103–393, 108 Stat. 4106 (Oct. 22, 1994).

This extended recital of the development of H.R. 5116 reveals that between 1991 and 1994 both houses of Congress repeatedly studied ways to *reduce* the protection of subordinate and "short term" mortgages in Chapter 13 cases.[5] In 1994, Congress insert-

---

5. That it may be necessary and proper to consid-

er the "resume of origin" of legislation has been.

ed language first considered in 1991, in § 311 of S.1985, into § 1322 as new subsection (c)(2). The introductory "[n]otwithstanding subsection (b)(2)," the inclusion of the power to modify, and the cross reference to § 1325(a)(5) all bespeak an intent to afford short term residential mortgages less protection from modification in Chapter 13 cases. Our reading of § 1322(c)(2) is true to that intent.

That the legislative history nowhere states an intent to "overrule *Nobelman*" in 1994 is completely understood in this context. *Nobelman* is mentioned and discussed in the Committee Report accompanying S. 540, the Senate's companion bill to H.R. 5116. That discussion appropriately explained that S. 540, § 306, "confirms protection from cramdowns for first mortgages and for secondary mortgages that deserve such protection," while acknowledging that the proposed legislation would authorize Chapter 13 debtors to "modify secondary security interests in residential real estate under certain circumstances."

In *Nobelman*, the Supreme Court held that "bifurcation" or "claim splitting" is a "modification" for purposes of § 1322(b)(2). That proposition was much disputed in the conflicting courts of appeals decisions that led up to *Nobelman*.[6] Because the mortgage at issue in *Nobelman* was within the class of real estate secured claims protected from modification by § 1322(b)(2), the *Nobelman* court held that the debtors' proposed bifurcation was precluded by § 1322(b)(2). *Nobelman*, 508 U.S. at 330, 113 S.Ct. at 2110–11.

*Nobelman* is not overruled by § 1322(c)(2)—it is still the law that a mortgage protected from modification by § 1322(b)(2) cannot be bifurcated. The 1994 enactment of § 1322(c)(2) changed the class

of mortgages that are protected from modification by § 1322(b)(2) without overruling any aspect of the Supreme Court's holding in *Nobelman*. *Nobelman* deals with the meaning of the words in § 1322(b)(2); § 1322(c)(2) defines a narrow class of claims to which those words do not apply. The introductory, "[n]otwithstanding subsection (b)(2)," made it inappropriate to "overrule" *Nobelman* in the legislative discussion of § 1322(c)(2). *See Mattson*, 210 B.R. at 160 (That there is no mention of *Nobelman* in the legislative history is of no moment because § 1322(c)(2) created only an additional exception to § 1322(b)(2) as interpreted by *Nobelman*; § 1322(c)(2) did not overrule *Nobelman*.)

The dissent mischaracterizes our holding as a rejection of the mortgageholders' rights analysis in *Nobelman*. *See ante* at 480. Justice Thomas recognized in *Nobelman* that the protection from modification afforded most home mortgages by § 1322(b)(2) was not complete: three subsections later, in § 1322(b)(5), Congress authorized Chapter 13 debtors to cure defaults and maintain payments on home mortgages "notwithstanding" § 1322(b)(2). *Nobelman*, 508 U.S. at 329, 113 S.Ct. at 2110. Curing default through a Chapter 13 plan would violate the mortgageholder's rights identified in *Nobelman* but for the explicit Congressional statement that the power to cure defaults in § 1322(b)(5) is available "notwithstanding paragraph [1322(b) ](2) of this subsection." 11 U.S.C. § 1322(b)(5). In 1994, Congress did exactly the same thing in § 1322(c)(2) as it did in 1978 in § 1322(b)(5): the new power to modify short term mortgages in § 1322(c)(2) does not violate the rights of mortgageholders identified in *Nobelman* because modification of short term mortgages is available "[n]otwithstanding subsection

---

recognized by the Supreme Court. *See Standard Oil Co. v. FTC*, 340 U.S. 231, 259–61, 71 S.Ct. 240, 254–56, 95 L.Ed. 239 (1951) ("Events in the course of the proposed legislation in the Senate and House have pertinence.").

**6.** Prior to the Supreme Court's *Nobelman* decision, at least four Circuits held that § 1322(b)(2) allowed bifurcation of undersecured homestead mortgages. *Bellamy v. Federal Home Loan Mortgage Corp. (In re Bellamy)*, 962 F.2d 176 (2d Cir.1992); *Eastland Mortgage Corp. v. Hart (In re*

*Hart)*, 923 F.2d 1410 (10th Cir.1991); *Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123 (3d Cir.1990); *Hougland v. Lomas & Nettleton Co. (In re Hougland)*, 886 F.2d 1182 (9th Cir.1989). The Fifth Circuit in *Nobleman* held to the contrary. *Nobleman v. American Savs. Bank (In re Nobleman)*, 968 F.2d 483 (5th Cir.1992) (editor's note to the circuit court decision indicates that the correct spelling of the debtors' name is "Nobelman," but that the style of the case would remain as docketed).

(b)(2)." 11 U.S.C. § 1322(c)(2). Far from rejecting *Nobelman,* this plain reading of § 1322(c)(2) is a faithful application of Justice Thomas's analysis of the critical words that § 1322(b)(5) and § 1322(c)(2) have in common.

The cases that the legislative history says are "overruled" by § 1322(c)(2) support our reading of the new section. In *Perry,* the debtor proposed to pay a mortgage foreclosure judgment in full with interest over the life of her Chapter 13 plan. The mortgagee objected that the plan violated the protection from modification in § 1322(b)(2). The bankruptcy court confirmed, the district court reversed.

On appeal, the Third Circuit faced a landscape littered with § 1322(b)(2) cases. In *Roach,* also referenced in the 1994 legislative history, the court previously held that the power to cure mortgage defaults was not available to a Chapter 13 debtor once a judgment of foreclosure was entered. After *Roach,* the Third Circuit held in *Wilson v. Commonwealth Mortgage Corporation,* 895 F.2d 123 (3d Cir.1990), that § 1322(b)(2) applies only to "secured claims." Put another way, in *Wilson,* the Third Circuit concluded that § 1322(b)(2) does not protect from modification the unsecured portion of an undersecured mortgage in a Chapter 13 case.[7]

Writing in the wake of *Wilson* and *Roach,* the *Perry* court concluded:

> Because *Wilson* eliminated the only other major protection that § 1322(b)(2) could have provided home lenders, we must either find home lenders protected against the "modification" that Perry proposes or else give home lenders essentially the same treatment as other lenders. . . . If § 1322(b)(2) is to provide home mortgage lenders with any meaningful protection, it must prohibit Chapter 13 plans that modify their rights by allowing the debtor to pay a foreclosure judgment over the three to five years of the plan.

*Perry,* 945 F.2d at 66–67.

The result in *Perry,* according to the Committee Report to H.R. 5116, was to prohibit a Chapter 13 plan from providing for a mortgage debt "by paying the full amount of the *allowed secured claim* in accordance with Bankruptcy Code section 1325(a)(5)(4)27" H.R.Rep. No. 835, 103d Cong., 2d Sess. 52 (emphasis added). By overruling this result in 1994, Congress sought to allow a Chapter 13 debtor to "provide for a mortgage debt by paying the full amount of the allowed secured claim in accordance with Bankruptcy Code section 1325(a)(5)." This is our plain language reading of § 1322(c)(2).

*Witt* recognized this was the intent of the 1994 amendments to § 1322(c); however, the court failed to appreciate the terms of art in the Committee Report. *Witt* states: "§ 1322(c)(2) was only intended to allow payments to be stretched out over time; the debtor is still required to pay the 'full amount of the *allowed secured claim.'*" *Witt,* 113 F.3d at 512 (quoting the Committee Report on H.R. 5116)(emphasis added). The court misconstrued "full amount of the allowed secured claim" to signal Congressional intent to require payment in full of the unsecured portion of an undersecured claim.

The dissent and *Witt* argue in the alternative that the plain reading of § 1322(c)(2) is such a remarkable departure from pre–1994 bankruptcy law that plain meaning should be rejected in the absence of legislative history to signal the change. *See ante* at 481. This conclusion is mistaken on two levels.

New § 1322(c)(2) is hardly a revolution in bankruptcy law. Since 1979 it has been true in Chapter 13 cases that a home mortgage not protected from modification by § 1322(b)(2) can be bifurcated pursuant to § 1325(a)(5). *See, e.g., Wilson v. Commonwealth Mortgage Corp.,* 895 F.2d 123, 128 (3d Cir.1990) (home mortgage containing security interests in personal property is not protected from claim splitting in a Chapter 13 case); *Bank One, Chicago v. Flowers,* 183 B.R. 509, 514 & n. 3 (N.D.Ill.1995) (collecting cases) (observing that the "overwhelming majority" of courts have held that lien strip-

---

7. This is the part of the Third Circuit Trilogy—*Roach, Wilson* and *Perry*—that was reversed by the Supreme Court in *Nobelman.*

ping is permissible in Chapter 13 cases when the collateral is not a protected principal residence). Even after *Nobelman* held that bifurcation is a modification prohibited by § 1322(b)(2), the courts have recognized that a residential mortgage that falls outside the protection from modification in § 1322(b)(2) can be bifurcated in a Chapter 13 case. *See Hammond v. Commonwealth Mortgage Corp. of Am. (In re Hammond)*, 27 F.3d 52, 57 (3d Cir.1994) (*Nobelman* does not change the rule in *Wilson* that a home mortgage avoids bifurcation only if it is protected from modification by § 1322(b)(2)); *see also Harmon v. United States*, 101 F.3d 574, 582 (8th Cir.1996) ("In Chapter 13, it is not seriously disputed that lien-stripping is permissible outside the realm of home mortgages controlled by *Nobelman*."). New § 1322(c)(2) acknowledges this longstanding distinction between mortgages that are protected from modification by § 1322(b)(2) and mortgages that can be bifurcated in a Chapter 13 case. Using almost exactly the same words Congress used 20 years ago in § 1322(b)(5), new § 1322(c)(2) carefully takes exception to the protection from modification in § 1322(b)(2), and then cross references § 1325(a)(5), the traditional source of the power to bifurcate and cram down undersecured claims in Chapter 13 cases.

New § 1322(c)(2) departs from prior law only by identifying a narrow class of short term mortgages that were protected from modification before 1994 and now are not. This is not the legislative announcement of new principles that has sometimes inspired courts to doubt plain language in the absence of legislative history. *See, e.g., Dewsnup v. Timm*, 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992). Rather, § 1322(c)(2) is the precise application of well known concepts and terms of art in a familiar context.

■ More fundamentally, silence in legislative history cannot create the ambiguity of language that is predicate to the principle of statutory construction the dissent purports to apply. Justice Blackmun stated it clearly in *Dewsnup*: "Of course, where the language is unambiguous, silence in the legislative history cannot be controlling." *Dewsnup*, 502 U.S. at 419–20, 112 S.Ct. at 779. As detailed

above, the only ambiguity discussed in *Witt* is resolved by the unambiguous cross reference to § 1325(a)(5) in § 1322(c)(2) itself. The dissent does not suggest any other lack of clarity in § 1322(c)(2). It is not appropriate to overwhelm the plain meaning of this less than startling new statute with silence from legislative history.

### C. Policy Considerations

Congress afforded residential mortgagees protection from modification in § 1322(b)(2), "to encourage the flow of capital into the home lending market...." *Nobelman*, 508 U.S. at 332, 113 S.Ct. at 2112. First Union and the dissent quote *Witt* and *Perry* for the argument that a plain language reading of § 1322(c)(2) "could make it more difficult in the future for those similarly situated ... to obtain any financing at all." *Witt*, 113 F.3d at 514. *See also Perry*, 945 F.2d at 63–64.

This concern for the economics of the home mortgage market can only justify departure from the plain meaning of the words in § 1322(c)(2) if the plain language produces a result " 'demonstrably at odds with the intention of its drafters.' " *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). The dissent and *Witt* quote at length the policy discussions of a different section of the Bankruptcy Code— § 1322(b)(2), enacted in 1978—as proof that new § 1322(c)(2) cannot mean what it says. *See ante* at 480. The dissent does not and cannot cite any provision of the 1994 legislative history of § 1322(c)(2) itself that is contrary to, much less "demonstrably at odds" with the plain words in this new section. That the legislative intent of § 1322(b)(2) in 1978 collides with the plain language of § 1322(c)(2) in 1994 is exactly what would be expected: new § 1322(c)(2) states that it is a statutory exception to the protection from modification in § 1322(b)(2). As detailed above, the legislative history that is relevant to what became § 1322(c)(2) shows that Congress considered the need for this additional exception to § 1322(b)(2) continuously between 1991 and 1994. Intent to protect home mortgage lending in Chapter 13 cases

was balanced by Congress with exceptions, including § 1322(b)(5), and now § 1322(c)(2). This balancing of debtor and creditor interests is not demonstrably at odds with any statement of Congressional intent.

With respect to the substance of these economic policy arguments, the *Young* and *Mattson* courts explain that § 1322(c)(2) impacts a very narrow sub-market of home mortgages. *Mattson*, 210 B.R. at 161 ("The section will typically apply to second mortgages such as this one, which are based very little on the value of the home and more on the leverage provided by having a mortgage on a debtor's homestead. A true first mortgage, payable over a longer term ..., will rarely, if ever, be undersecured, especially when the last payment is coming due during the term[ ] of a plan."); *Young*, 199 B.R. at 653 n. 12; *see also Bagne*, 219 B.R. at 277 ("The loans described in § 1322(c)(2), ..., are of an entirely different nature [than those afforded protection under § 1322(b)(2) ]. These short-term, high-interest rate home equity loans are more akin to consumer financing than traditional home lending. [citation and footnote omitted.] To read the statute [as suggested] would extend to consumer financing the special protection afforded to home lenders."). Rarely will this provision affect the holder of a traditional residential, long term mortgage, because any long term mortgage that is payable within the term of a Chapter 13 plan will not likely be undersecured. The focus of § 1322(c)(2) is short term, often high interest, second and nontraditional mortgages, to which those in financial distress sometimes fall victim. There is no evidence that claim splitting in Chapter 13 cases in this discrete arena threatens the flow of capital into the broader home mortgage market.

## V. CONCLUSION

Section 1322(c)(2) creates a narrow exception to the protection from modification in § 1322(b)(2) that includes the power to "bifurcate" or split undersecured claims within its reach, consistent with § 1325(a)(5). The judgment of the bankruptcy court is AFFIRMED.

STOSBERG, dissenting.

Congress clouded rather than clarified the rights of debtors to modify claims secured by home mortgages when it enacted 11 U.S.C. § 1322(c)(2) and any endeavor to address the majority's reasoning seems futile in light of the conflicting approaches by various courts. Indeed, *In re Young*, 199 B.R. 643 (Bankr. E.D.Tenn.1996), supplies sufficient support for the majority's decision.

The context for favoring bifurcation and cramdown presupposes that "saving the home" should serve as the controlling element in deciding whether to confirm a Chapter 13 plan. As an isolated proposition, no one can quarrel with the basic idea of saving the home. I question whether there is really anything to save when the Debtors have zero equity and they have already proven that they are incapable of making burdensome payments. Nonetheless, a particular court's philosophy cannot provide the debtor financial salvation in the form of a bifurcated 100% mortgage in derogation of the safeguards found in other provisions of the Bankruptcy Code.

The majority rejects the result dictated by *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), especially in the context of Justice Thomas' "protection of rights" analysis.

> The bank's "rights," therefore, are reflected in the relevant mortgage instruments, which are enforceable under Texas law. They include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure. [citations omitted]. These are the rights that were "bargained for by the mortgagor and the mortgagee," *Dewsnup v. Timm*, 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992), and are rights protected from modification by § 1322(b)(2).

*Id.* at 329–30, 113 S.Ct. at 2110.

But like it or not, Congress has granted these special protections since the enactment

of the Bankruptcy Code in 1978. I quote generously from *First National Fidelity Corp. v. Perry*, 945 F.2d 61(3d Cir.1991), which summarizes the approach to home mortgage loans:

> "The purpose of chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period." H.R.Rep. No. 595, 95th Cong., 1st Sess. 118 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6079. To achieve this purpose, Chapter 13 generally allows modification of creditors' claims to allow debtors the necessary time to repay their debts. This power of modification was extended in Chapter 13 to claims secured by real estate that had been excluded from plans under the old chapter XIII. But testimony by representatives of secured creditors resulted in § 1322(b)(2)'s exception of home mortgages from that general power of modification. Congress apparently accepted predictions by representatives of secured creditors' interests that
>
> > savings and loans will continue to make loans to individual homeowners, but they will tend to be ... extraordinarily conservative and more conservative than they are now in the flow of credit. [Home mortgage lenders] will have to recognize that there is an additional business risk presented [if a bill is passed] providing for the possibility of modification of the rights of the secured creditor in the residential mortgage area.
>
> *Bankruptcy Reform Act of 1978: Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 95th Cong., 1st Sess. 707, 715 (1977) (statement of Robert E. O'Malley). As the Court of Appeals for the Sixth Circuit has observed,
>
> > Congress had to face the reality that ... [e]very protection Congress might grant a homeowner at the expense of the holders of security interests on these homes would decrease the attractiveness of home mortgages as investment opportu-

nities [and the availability of home mortgage financing]. *In re Glenn*, 760 F.2d 1428, 1434 (6th Cir.1985); *see also Id.* at 1433 n. 1; *Grubbs v. Houston First Amer. Sav. Ass'n*, 730 F.2d 236, 245–46 (5th Cir.1984) (en banc).

> Thus, the prohibition found in § 1322(b)(2) against modification of the rights of home mortgage lenders was intended to make home mortgage money on affordable terms more accessible to homeowners by assuring lenders that their expectations would not be frustrated. The only exception to this assurance is § 1322(b)(5) which allows a Chapter 13 debtor to "cure" his mortgage after a default.

*Id.* at 63–64.

After the *Perry* court denied the right of the debtor to pay a foreclosure judgment over the life of a plan, Congress enacted 1322(c)(2) and in the legislative history specifically indicated its intent to overrule *Perry*. The *Young* court overextends, in my view, the reach of § 1322(c)(2) for the reasons articulated in a Comment by Timothy B. McCaffrey, Jr. in the Loyola of Los Angeles Law Review:

> To summarize, Congress's express mention of *Perry* indicates that § 1322(c)(2) permits debtors to modify principal and interest payments of mortgage obligations that mature immediately before the filing of, or during, a chapter 13 plan. But Congress's desire to overrule *Perry* does not support an interpretation of § 1322(c)(2) that permits bifurcation and cramdown of undersecured homestead mortgagees' claims. Rather, under the Supreme Court's analysis in *Dewsnup*, a court should not interpret § 1322(c)(2) as permitting bifurcation and cramdown of undersecured homestead mortgagees' claims that come due before or during a chapter 13 plan because Congress did not indicate it intended to overrule *Nobelman* with respect to such mortgages. Indeed, if Congress wanted to overrule a recent United States Supreme Court case, why would it not say so? (footnotes omitted).

Timothy B. McCaffrey, Jr., *From Dewsnup to Nobelman to the Bankruptcy Reform Act*

of 1994: Did Congress Intend to Change "Pre–Amendment" Law When It Enacted § 1322(c)(2)?, 30 LOY. L.A.L. REV. 841, 860 (1997).

Further, the author continues:

Finding the language of § 1322(c)(2) unambiguous, the *Young* court permitted the debtor to bifurcate and cramdown the undersecured homestead mortgagee's claim under § 1322(c)(2). But the *Young* court's reliance on this statement is misplaced. As stated earlier, it is unclear why the Court found the provision at issue in *Dewsnup* ambiguous. The Supreme Court's failure to explain its conclusion should make lower courts wary, absent at least some indication by Congress that is intended to effect such a change, of interpreting a new Code provision to alter preexisting practice. Indeed, relying on the Court's finding of ambiguity as the basis for its examination of § 506(d)'s legislative history ignores the Court's underlying concern that it should be prudent when interpreting a Code provision that might alter a preexisting bankruptcy practice.

*Id.* at 861 (footnotes omitted).

Finally, at the Circuit level, I find this view reinforced in *Witt v. United Companies Lending Corporation*, 113 F.3d 508 (4th Cir. 1997). Analyzing the legislative history, the *Witt* court notes:

It makes no mention of the *Nobelman* decision or of any intention to overrule that decision. The Witts' interpretation of the statute, however, would directly overrule *Nobelman*. Had Congress intended to overrule *Nobelman*, we expect Congress would have discussed that in the legislative history. Although the Report directly refers to forty cases, including three Supreme Court cases, that the Act was intended to overrule, *Nobelman* is not one of them. The Witts offer no reason why Congress would have failed to include *Nobelman* in this list if it was actually overruled by § 1322(c)(2).

"It is firmly entrenched that Congress is presumed to enact legislation with knowledge of the law." *United States v. Langley*, 62 F.3d 602, 605 (4th Cir.1995)(en banc), *cert. denied*, 516 U.S. 1083, 116 S.Ct.

797, 133 L.Ed.2d 745 (1996). The upshot of this canon of statutory interpretation is that "absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction." *Id.* (quoting *Estate of Wood v. C.I.R.*, 909 F.2d 1155, 1160 (8th Cir.1990) (quoting *Johnson v. First Nat'l Bank of Montevideo*, 719 F.2d 270, 277 (8th Cir.1983))). Congress certainly intended the Bankruptcy Reform Act of 1994 to overrule judicial precedent in a number of different areas. There is no "clear manifestation," however, that Congress intended to overrule *Nobelman*. We believe it ill-advised to give such a drastic interpretation to § 1322(c)(2) without congressional support. As we said in *Langley*, "[i]f Congress intended such a revolutionary change in the law, ... it would have made clear its intention to do so." *Langley*, 62 F.3d at 606; *cf. Dewsnup v. Timm*, 502 U.S. 410, 419, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) ("[T]his Court has been reluctant to accept arguments that would interpret the Code ... to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.") (footnotes deleted).

*Id.* at 513.

I further note that the Fourth Circuit "recognized" their decision would make the Witts' fresh start a little tougher, but it balanced that effect against the impact on prospective future loans to other debtors. And it also noted that § 1322(c)(2) "still provides significant relief for homeowners in Chapter 13 who need more flexibility ... by paying the remaining part of the debt over the life of a Chapter 13 plan." *Id.* at 514.

Although Congress may not have offered crystal clear language in passing § 1322(c)(2), it obviously knew about *Nobelman*. *Nobelman's* precedent notwithstanding, Congress instead chose to overrule *Perry* which convinced the *Witt* court to prohibit bifurcation. I agree with *Witt* and therefore respectfully dissent.