FILED

NOV 13 2023

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>JASON M. LEE and JANICE CHEN,<br>              Debtors. | BAP No. CC-22-1250-FLC<br><br>Bk. No. 8:22-bk-10127-MH |
| MISSION HEN LLC,<br>          Appellant,<br>v.<br>JASON M. LEE; JANICE CHEN;<br>AMRANE COHEN, Chapter 13 Trustee,<br>          Appellees. | OPINION |

Appeal from the United States Bankruptcy Court
for the Central District of California
Mark D. Houle, Bankruptcy Judge, Presiding

APPEARANCES:

Sanford P. Shatz of McGlinchey Stafford argued on behalf of appellant;
Michael Smith of Shioda, Langley & Chang LLP argued on behalf of
appellees Jason M. Lee and Janice Chen.

Before: FARIS, LAFFERTY, and CORBIT, Bankruptcy Judges.

FARIS, Bankruptcy Judge:

## INTRODUCTION

Debtors Jason M. Lee and Janice Chen proposed a chapter 13[1] plan

---

[1] Unless specified otherwise, all chapter and section references are to the

that would bifurcate and cram down the claim of Mission Hen, LLC that is secured by a junior lien on the Debtors' residence. The bankruptcy court confirmed the plan over Mission Hen's objections.

Mission Hen appeals, arguing that the plan violated the anti-modification provision of § 1322(b)(2) by bifurcating its claim into secured and unsecured portions. The Debtors argue that § 1322(c)(2) creates an exception to the general rule against modification that applies to claims like Mission Hen's that mature during the plan term. Mission Hen also argues that the Debtors were ineligible for chapter 13 relief and that the plan was not feasible.

Mission Hen does not establish reversible error. We AFFIRM.

We publish to address the effect of § 1322(c)(2) on secured debts that mature during the plan term, which appears to be an issue of first impression at the appellate level in this circuit, and the calculation of a chapter 13 debtor's eligibility given the procedural history of the case.

## FACTS

### A.    Prepetition events

In December 2006, Mr. Lee executed a promissory note in the sum of $846,359 (the "First Mortgage") in favor of IndyMac Bank, F.S.B. The note was secured by a deed of trust encumbering the residence of Mr. Lee and Ms. Chen (the "Property"). IndyMac Bank transferred its beneficial interest

---

Bankruptcy Code, 11 U.S.C. §§ 101-1532.

to Deutsche Bank National Trust Company.

Around the same time, Mr. Lee took out a home equity line of credit (the "HELOC") with IndyMac Bank, which was secured by a second deed of trust on the Property. The original credit limit was $211,589, and the maturity date was January 15, 2027. Mission Hen is the current holder of the HELOC and deed of trust.

Beginning in 2020, Mr. Lee defaulted on both the First Mortgage and the HELOC. Both lenders recorded notices of default. Mission Hen also recorded a notice of trustee's sale.

## B.    The bankruptcy petition

On January 26, 2022, Mr. Lee and Ms. Chen jointly filed a chapter 13 petition and schedules. In their Schedule A/B, they scheduled the Property and stated that its current value was $1.045 million. They did not claim any exemption in the Property.

The Debtors scheduled claims secured by the Property. They identified the First Mortgage as a $952,510.26 secured claim and scheduled the HELOC as a "disputed" secured claim of $465,670.41, of which $373,180.67 was unsecured (meaning that $92,489.74 was secured). The Debtors also scheduled two community association claims secured by the Property ($21,030.39 and $11,060.08), both of which they indicated were unsecured. Additionally, they scheduled $83,185.04 of unsecured nonpriority claims.

The Debtors reported that their combined monthly income was

3

$10,010.95, which included a $1,200 monthly contribution from Ms. Chen's parents. After accounting for their monthly expenses, their net monthly income was $2,197.74.

## C.     The proposed chapter 13 plan

The Debtors' proposed chapter 13 plan provided that the Debtors would cure and maintain payments on the First Mortgage. The plan would bifurcate Mission Hen's second-position claim into secured and unsecured portions and pay only the secured portion at five percent interest. The plan did not include payment of any other debt.

The Debtors indicated that they would file a motion to value the Property and avoid Mission Hen's lien. They also intended to avoid the community association liens.

## D.     The valuation motion

Mr. Lee filed a motion for an order determining the value of the Property ("Valuation Motion"). He sought the value determination because he intended to bifurcate Mission Hen's claim under § 506(a), treating the portion of the debt covered by the value of the Property as a secured claim and the remainder as an unsecured claim. He asserted that the Property was worth $1.045 million. This meant that the First Mortgage was fully secured at $952,510.26; the secured portion of the HELOC was $92,489.80; and the unsecured portion was $364,180.61.

**E.     Mission Hen's objections to the chapter 13 plan and Valuation Motion**

Mission Hen objected to the proposed plan. First, it asserted that the fair market value of the Property was significantly higher and that its claim was fully secured. Second, it argued that the plan failed to properly calculate the interest due on its claim. Third, it argued that the plan was not feasible because the Debtors would not be able to fund the plan. Finally, it contended that the Debtors had not established that all of the expenses in their schedules were "reasonably necessary."

Mission Hen similarly opposed the Valuation Motion. It contended that the Property's true value was $1.36 million.

The bankruptcy court held an evidentiary hearing and issued an order ("Valuation Order") finding that the value of the Property on the petition date was $1.225 million. Accordingly, it ruled that the secured portion of Mission Hen's claim was $265,473.06 and the unsecured portion was $204,030.50.

**F.     First amended plan**

The Debtors filed a first amended plan. Based on the higher value of the Property fixed by the court, they increased their plan payments to pay the secured portion of the HELOC in full. Because their income had not increased, they accomplished the higher plan payment by increasing Ms. Chen's parents' monthly contribution from $1,200 to $4,900.

Ms. Chen's mother, Linda Chen, filed a declaration in support of the

amended plan. She said that she and her husband had been residing at the Property with the Debtors since September 2021 and paying the Debtors $1,200 per month in rent. In January 2022, the sale of their home closed, and they netted the $910,000 sale price minus transaction costs. (She attached a copy of the closing statement to her declaration, although the declaration did not directly authenticate the document.) As a result, she stated that they were able and willing to increase their monthly contribution to $4,900. She confirmed that she was committed to making the contribution for the five-year plan term and did "not foresee any financial difficulty continuing to do so." She said that she had the ability to make the monthly contribution and did not have any other housing expense.

## G. Second amended plan

Mission Hen objected to the amended plan, so the Debtors filed a second amended plan in response. Mission Hen objected to the second amended plan, arguing (for the first time) that the Debtors were ineligible to proceed as chapter 13 debtors because they exceeded the unsecured debt limits. It calculated that the unsecured claims on the claims register ($195,287.72), the unsecured portion of its HELOC claim ($204,030.50), and the two community association liens ($32,679.31 and $10,281.66) totaled $442,279.19, which exceeded the statutory limit of $419,275 set forth in § 109(e). It also argued that the Debtors failed to use the appropriate interest rate, that the plan was unfeasible because the Debtors failed to

6

substantiate Mr. Lee's gross monthly income, and that the Debtors did not satisfy the best efforts test.

**H.    Third amended plan and objections**

The Debtors filed a third amended plan that provided for periodic increases in the monthly plan payments.

Mission Hen objected to the third amended plan, maintaining that the Debtors were ineligible because they had too much unsecured debt.

Mission Hen further argued that the plan was not feasible. Among other things, Mission Hen argued that there was insufficient evidence to support Ms. Chen's parents' ability to make the contribution. Furthermore, even with the contribution, the Debtors' income was insufficient: from the tenth month of the plan, the plan payments would exceed the Debtors' monthly net income by approximately $400.

For the first time, Mission Hen argued that the plan violated the anti-modification provision of § 1322(b)(2). It argued that a chapter 13 plan may not modify a lien secured only by a debtor's principal residence, including a claim that is undersecured. While § 1322(c)(2) allows a modification of a "payment of the claim" if the final payment falls within the plan term, Mission Hen argued that the statute allows for modification of only the payment term, not the claim itself.

**I.    Fourth amended plan and response to objections**

The Debtors filed a fourth amended plan that fixed typographical and calculation errors but otherwise left the bulk of the prior plan intact.

7

The Debtors also responded to Mission Hen's objection to the third amended plan. First, they argued that their unsecured debt was within the limit of § 109(e). They contended that the court should determine the amount of their debt by looking at the initial schedules, ascertain whether the debtors filed the schedules in good faith, and make an adjustment based on its Valuation Order. They asserted that, based on this formula, the unsecured claims totaled $400,318.22 and were within § 109(e)'s statutory limit.

Second, as to feasibility, the Debtors contended that Linda Chen's declaration was sufficient.

Third, the Debtors argued that recent case law explicitly allows a debtor to strip down a secured lien that matures during the life of the chapter 13 plan under § 1322(c)(2).

**J.     Confirmation of the fourth amended plan**

The bankruptcy court held a hearing on plan confirmation and other matters. The chapter 13 trustee indicated that he had no objection to the feasibility of the fourth amended plan. The bankruptcy court expressed concern about Linda Chen's declaration regarding her monthly contribution to the Debtors' plan payments. It stated that she had attached her closing statement to her declaration, but it was not authenticated; furthermore, the declaration only offered a conclusory statement that she would continue making the payments, without discussing her financial ability to do so. Nevertheless, the court found that the plan was feasible for

8

three reasons: the Trustee did not object to feasibility, Mission Hen did not file an evidentiary objection, and Linda Chen's declaration, "while not great[,]" was "enough to satisfy the feasibility."

The court next rejected Mission Hen's argument that the anti-modification provision in § 1322(c)(2) prevented cramdown of Mission Hen's HELOC claim. It held: "From the case law it appears pretty clear . . . that Congress intended debtors to be able to do what they're trying to do. It's just that the statute is not written very well."

The bankruptcy court confirmed the fourth amended plan over Mission Hen's objection. Mission Hen timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(K) and (L). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court erred in confirming the Debtors' chapter 13 plan over Mission Hen's objections regarding: (1) the bifurcation and cramdown of its lien; (2) the Debtors' chapter 13 eligibility; and (3) the feasibility of the plan.

## STANDARDS OF REVIEW

We review a decision to confirm a plan for abuse of discretion. *Comput. Task Grp. v. Brotby (In re Brotby)*, 303 B.R. 177, 184 (9th Cir. BAP 2003). To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether

9

the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, we consider whether the bankruptcy court's application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

"Of course, a determination that a plan meets the requisite confirmation standards necessarily requires a bankruptcy court to make certain factual findings and interpret the law*." In re Brotby*, 303 B.R. at 184.

"We review the bankruptcy court's factual findings regarding whether a plan satisfies confirmation requirements for clear error." *Legal Serv. Bureau, Inc. v. Orange Cnty. Bail Bonds, Inc. (In re Orange Cnty. Bail Bonds, Inc.)*, 638 B.R. 137, 145 (9th Cir. BAP 2022). Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). If two views of the evidence are possible, the court's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

We review the bankruptcy court's interpretation of the Bankruptcy Code de novo. Additionally, "[e]ligibility determinations under § 109 involve issues of statutory construction and conclusions of law, including interpretation of Bankruptcy Code provisions, which we review de novo." *Smith v. Rojas (In re Smith)*, 435 B.R. 637, 642 (9th Cir. BAP 2010). "De novo review requires that we consider a matter anew, as if no decision had been

10

made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014).

## DISCUSSION

### A. The bankruptcy court did not err in allowing the Debtors to modify Mission Hen's claim.

Mission Hen argues that its claim was protected by the anti-modification provision of § 1322(b)(2) and that the bankruptcy court erroneously allowed the Debtors to bifurcate its claim under § 506(a) and treat part of its claim as unsecured. We discern no error.

Section 1322(b)(2) provides that a chapter 13 plan may "modify the rights of holders of secured claims, **other than a claim secured only by a security interest in real property that is the debtor's principal residence**, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]" (Emphasis added.) The highlighted portion of this section is known as the "anti-modification provision."

Section 1322(c)(2) provides an exception to the anti-modification provision:

> (c) **Notwithstanding subsection (b)(2)** and applicable nonbankruptcy law—
>
> . . .
>
> (2) **in a case in which the last payment on the original payment schedule** for a claim secured only by a security interest in real property that is the debtor's principal residence **is due before the date on which the final**

11

> **payment under the plan is due, the plan may provide
> for the payment of the claim as modified pursuant to
> section 1325(a)(5)[2] of this title[.]**

§ 1322(c)(2) (emphases added). In other words, because the Mission Hen

HELOC matures (on January 15, 2027) during life of the Debtors' chapter

13 plan, "the plan may provide for the payment of the claim as modified."

The parties dispute, however, whether this language allows the Debtors to

modify the payment terms only, or the actual claim itself.

Mission Hen asserts that the reasoning of *Nobelman v. American*

*Savings Bank*, 508 U.S. 324 (1993), prohibits the bankruptcy court from

modifying anything other than the repayment terms of its claim. In

*Nobelman*, the bankruptcy court denied confirmation of a chapter 13 plan

that would have allowed the debtors to bifurcate the secured creditor's lien

on their real property into unsecured and secured claims and to make

payments on only the secured portion.

The U.S. Supreme Court concluded that the proposed bifurcation and

cramdown were impermissible:

> [T]o give effect to § 506(a)'s valuation and bifurcation of
> secured claims through a Chapter 13 plan in the manner
> petitioners propose would require a modification of the rights
> of the holder of the security interest. Section 1322(b)(2)
> prohibits such a modification where, as here, the lender's claim

---

[2] In summary, § 1325(a)(5) permits reducing secured claims under § 506(a) to the value of the collateral securing the debt and treating the balance of the claim as unsecured.

is secured only by a lien on the debtor's principal residence.
*Id.* at 332.

Mission Hen's argument based on *Nobelman* fails. The Court's decision was founded on statutory interpretation. About a year after the *Nobelman* decision, Congress amended the statute by enacting current § 1322(c)(2). Congress undoubtedly has the power to overcome the Supreme Court's interpretation of a statute by amending the statute. *Nobelman* does not help us construe the amended statute. *See In re Collier-Abbott*, 616 B.R. 117, 122 (Bankr. E.D. Cal. 2020) ("When the Supreme Court issued its ruling in *Nobelman*, there was not, and there could not have been, consideration of the then yet to be enacted exception to 11 U.S.C. § 1322(b)(2) residence secured claim valuation limitation.").

Although the Ninth Circuit has not squarely addressed whether § 1322(c)(2) permits the bifurcation and stripdown of an undersecured, soon-to-mature claim, the Fourth Circuit, Eleventh Circuit, and other courts have answered in the affirmative.

Originally, the Fourth Circuit agreed with Mission Hen's position. In *Witt v. United Companies Lending Corp. (In re Witt)*, 113 F.3d 508 (4th Cir. 1997), it held that § 1322(c)(2) permitted modification of payments on a claim, but not the claim itself.

Over twenty years later, the Fourth Circuit overruled *Witt* in *Hurlburt v. Black*, 925 F.3d 154 (4th Cir. 2019) (en banc). It noted that "other courts universally have criticized *Witt*'s finding of ambiguity and attendant

reliance on the statute's legislative history. Commentators have reached the same conclusion—the plain language of Section 1322(c)(2) authorizes Chapter 13 plans to modify claims, not just payment schedules." *Id.* at 161 (citations omitted). The *Hurlburt* court held that

> the specific context in which the language is used, and the broader context of the statute as a whole, establishes that Section 1322(c)(2) is best read to authorize modification of "claim[s]," not just "payment[s]," and therefore that a Chapter 13 plan may bifurcate a claim based on an undersecured homestead mortgage, the last payment for which is due prior to a debtor's final payment under a repayment plan, into secured and unsecured components and cram down the unsecured component.

*Id.* (cleaned up). It stated that "the phrase 'payment of the claim as modified' is most naturally read as permitting the modification of claims, not payments . . . ." *Id.* at 162.

The Fourth Circuit also stated that the introductory phrase "[n]otwithstanding subsection (b)(2)" "indicates Congress intended for Section 1322(c)(2) to be an exception to or limitation on Section 1322(b)(2)'s anti-modification provision." *Id.* Finally, the court highlighted the phrase "pursuant to section 1325(a)(5) of this title[.]" It reasoned that,

> [b]y referencing a provision dealing with the modification of claims—and with the modification of claims by cramming down the unsecured component of an undersecured secured claim, in particular—as the source of authority for modification, Congress further indicated that it intended for Section 1322(c)(2) to authorize the modification of claims—not just

payments—including by bifurcating covered claims into secured and unsecured components and cramming down the unsecured component.

*Id.* at 163.

Other courts have reached the same conclusion as *Hurlburt*. *See, e.g.*, *Am. Gen. Fin., Inc. v. Paschen (In re Paschen)*, 296 F.3d 1203, 1207 (11th Cir. 2002) ("[T]he plain language of the statute indicates a clear congressional intent to except certain short-term mortgages from the general rule prohibiting the modification of claims secured only by an interest in a debtor's primary residence in a Chapter 13 proceeding."); *First Union Mortg. Corp. v. Eubanks (In re Eubanks)*, 219 B.R. 468, 474 (6th Cir. BAP 1998) (stating that "[r]esort to legislative history is not necessary to understand § 1322(c)(2)" but nevertheless examining legislative history and concluding that § 1322(c)(2) allows modification of an undersecured claim); *In re Collier-Abbott*, 616 B.R. at 123 ("This court's reading of the plain language of these interlocking statutory provisions renders the same result [as *Hurlburt*]. The plain language states that the limitations under 11 U.S.C. § 1322(c)(2) does not 'protect' the allowed claim coming due before the end of the plan from plan treatment as provided under 11 U.S.C. § 1325(a)(5)."); *see also* 8 Collier on Bankruptcy ¶1322.17 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("The exception from the modification prohibition also overrules for such mortgages the Supreme Court's decision in *Nobelman* . . . . That decision was based solely on section 1322(b)(2), to

15

which section 1322(c) is an exception. Again, it is not surprising that Congress would create an exception for the types of [short-term] mortgages described above, which are often undersecured." (footnotes omitted)); *cf. In re Bagne*, 219 B.R. 272, 276-77 (Bankr. E.D. Cal. 1998) ("[A] plain reading of § 1322(c)(2) . . . instructs the court to disregard § 1322(b)(2)."). In fact, we have found no decision after *Hurlburt* that would support Mission Hen's position.

Mission Hen largely ignores the above authority and argues that we should follow the overturned *Witt* decision and *Hurlburt*'s dissent. The dissent in *Hurlburt* accused the majority of effectively overruling *Nobelman* and contended that, under the "rule of the last antecedent," the phrase "'as modified pursuant to section 1325(a)(5)' immediately follows the phrase 'payment of the claim,' so the rule of the last antecedent comfortably supports the reading that only payments (of the claim) can be modified." 925 F.3d at 172-73 (Wilkinson, J., dissenting).

We are not persuaded by Mission Hen's reliance on an overruled case and a dissenting opinion. Rather, we agree with the overwhelming weight of authority that § 1322(c)(2) is not ambiguous and allows a modification of Mission Hen's claim.

Our analysis begins with the statutory language of § 1322(c)(2). If that language is plain, our analysis also ends there. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition

16

required by the text is not absurd—is to enforce it according to its terms." (cleaned up)); *Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115, 1121 (9th Cir. 2011) ("Our analysis begins, as it must, with the text of the statute in question. Under the 'plain meaning' rule, where the language of a statute is plain and admits of no more than one meaning the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." (cleaned up)).

We will only consult additional guides to interpretation, such as legislative history and the statute's context, if the statutory language is ambiguous. *Searcy v. Ada Cnty. Prosecuting Att'y's Off. (In re Searcy)*, 463 B.R. 888, 892 (9th Cir. BAP 2012), *aff'd*, 561 F. App'x 644 (9th Cir. 2014). A term is ambiguous if it is fairly susceptible to different reasonable interpretations. *Woods v. Carey*, 722 F.3d 1177, 1181 (9th Cir. 2013).

We join the above-cited cases in holding that § 1322(c)(2) is not ambiguous; that is, there is only one reasonable way to read and understand the statute.[3] We begin with the introductory phrase, "[n]otwithstanding subsection (b)(2)," and we agree with *Paschen* that this "phrase is a plain statement that subsection (b)(2)'s prohibition on the modification of loans secured only by an interest in a debtor's primary residence does not have any application to the class of claims that fall

---

[3] This is not to say that the statutory language is ideal or perfect. But "ambiguous" is not synonymous with "less than ideal" or "imperfect." The question is whether there is more than one *reasonable* way to read § 1322(c)(2), and we hold that there is not.

under § 1322(c)(2)." *In re Paschen*, 296 F.3d at 1207; *see also Hurlburt*, 925 F.3d at 162-63 ("Because Section 1322(c)(2) is an express exception to a statute dealing with the full panoply of contractual rights tied to a claim—not just the rights pertaining to payment—Section 1322(c)(2) is reasonably construed as dealing with the modification of claims in their entirety, not just the modification of payments."). In other words, § 1322(c)(2) explicitly eliminates § 1322(b)(2)'s limitation on loan modification as to soon-to-mature mortgages.

Next, we consider the application of the "rule of the last antecedent" to the phrase "as modified pursuant to section § 1325(a)(5) . . . ." Mission Hen contends that this phrase applies to the phrase "**payment** of the claim" as opposed to just the word "**claim**." We disagree; the rule of the last antecedent dictates that the "as modified" phrase modifies the word "claim." As *Paschen* points out, had Congress intended "as modified" to apply to "payment," it could have made its intention clear "by placing the modifier next to the phrase to be modified, such as through 'payments as modified on the claim,' or 'modified payments on the claim.'" *In re Paschen*, 296 F.3d at 1209; *see Hurlburt*, 925 F.3d at 161, 162 (holding that § 1322(c)(2) "is best read to authorize modification of 'claim[s],' not just 'payment[s],'" which represents "the most natural reading of the statutory language").

Furthermore, we agree with *Paschen* that the ending phrase "payment of the claim as modified pursuant to section 1325(a)(5)" reflects "an explicit statement of § 1322(c)(2)'s purpose: claims that fall within its ambit are

18

subject to bifurcation into secured and unsecured parts, with the unsecured portion subject to 'cramdown' pursuant to § 1325(a)(5)." *In re Paschen*, 296 F.3d at 1208. In other words,

> [s]ection 1322(c)(2) incorporates § 1325(a)(5) to define the new power to modify real estate secured claims within its reach. The plain meaning of the phrase "provide for payment of the claim as modified pursuant to section 1325(a)(5)" includes that undersecured claims will be valued, bifurcated and crammed down consistent with well-settled interpretations of § 1325(a)(5).

*In re Eubanks*, 219 B.R. at 471-72 (citations omitted); *see also Hurlburt*, 925 F.3d at 163. The rationale employed in the Fourth Circuit's *Witt* decision "advances no convincing explanation for the meaning of the reference to § 1325(a)(5) in the text of § 1322(c)(2)." *In re Paschen*, 296 F.3d at 1209.

Finally, Mission Hen's interpretation cannot be squared with other provisions of § 1322. "[F]amiliar canons of statutory construction" include "the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Cheneau v. Garland*, 997 F.3d 916, 920 (9th Cir. 2021) (en banc) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)). Mission Hen argues that a debtor must pay a claim like Mission Hen's in full but need not adhere to the contractual payment schedule. In other words, Mission Hen contends that, when Congress wrote "payment of the claim," it meant "**full payment** of the claim." But when Congress meant to require "full payment of the claim" in § 1322, it used the phrase

"full payment." *See* § 1322(a)(2) (stating that a chapter 13 plan "shall provide for the full payment" of certain priority claims); *cf.* § 1322(a)(4) (stating that a chapter 13 plan "may provide for less than full payment" of one type of priority claim). If Congress intended to require full payment in § 1322(c)(2), it would have said so. *See Adinolfi v. Meyer (In re Adinolfi)*, 543 B.R. 612, 621 (9th Cir. BAP 2016) ("[T]he best source of information about Congress' purpose is the words of the statutes it enacts.").

Therefore, because Mission Hen's secured claim matures during the plan term, the plain language of § 1322(c)(2) allows the Debtors to bifurcate and cram down the Mission Hen claim.[4] The bankruptcy court did not err in holding that Mission Hen's claim was not protected by the anti-modification provision.

## B.    The bankruptcy court did not err in determining that the Debtors were eligible for chapter 13 relief.

Mission Hen contends that the bankruptcy court erred in ruling that the Debtors were eligible chapter 13 debtors under § 109(e). Specifically,

---

[4] Even if the statutory language were ambiguous (and it is not), we would agree with the Sixth Circuit BAP's extensive analysis of the relevant legislative history in *Eubanks*, wherein it pieced together Congress' "intent to afford short term residential mortgages less protection from modification in Chapter 13 cases." *In re Eubanks*, 219 B.R. at 477; *see also id.* at 474-79; 8 Collier on Bankruptcy ¶ 1322.17 ("Congress obviously believed that debtors with such mortgages needed additional protection. Short-term and balloon payment mortgages often have high rates or terms that are particularly unfavorable, which Congress has deemed deserving of close scrutiny. And debtors nearing the end of a long-term mortgage often have large amounts of equity that could be lost in a foreclosure.").

Mission Hen maintains that the Debtors are bound by the debt calculations listed in their schedules and that they significantly exceeded both the secured[5] and unsecured debt limits. We disagree with Mission Hen.

Section 109(e) defines who is eligible to be a debtor under chapter 13 of the Bankruptcy Code. When the Debtors filed their petition in January 2022, the limit for noncontingent, liquidated, unsecured debt was $419,275, and the limit for noncontingent, liquidated, secured debt was $1,257,850.[6] We have stated that "eligibility debt limits should be strictly construed." *Soderlund v. Cohen (In re Soderlund)*, 236 B.R. 271, 274 (9th Cir. BAP 1999).

When a debt is undersecured, the unsecured portion of the claim is counted as unsecured debt for eligibility purposes. *Id.* at 273-74. "Refusing to count the undersecured portion of a secured creditor's claim as unsecured debt ignores reality and could lead to absurd results." *Id.* at 274.

As Mission Hen correctly points out, the Ninth Circuit has stated that "eligibility should normally be determined by the debtor's originally filed schedules, checking only to see if the schedules were made in good faith."

---

[5] Mission Hen asserts that, if we hold that the bankruptcy court erred in bifurcating its claim, then the First Mortgage and Mission Hen's HELOC exceed the secured debt limit of $1,257,850. Because we hold above that the bankruptcy court did not err in bifurcating and cramming down Mission Hen's claim, we do not address the secured debt limit. Additionally, Mission Hen apparently did not raise the issue of the secured debt limit in the bankruptcy court. We will not consider this new argument in the first instance on appeal. *Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009).

[6] Section 109(e) currently provides that only debtors with regular income "that owe, on the date of the filing of the petition, noncontingent, liquidated debts that aggregate less than $2,750,000 may be a debtor under chapter 13 of this title." § 109(e).

*Scovis v. Henrichsen (In re Scovis)*, 249 F.3d 975, 982 (9th Cir. 2001); *see Fountain v. Deutsche Bank Nat'l Tr. Co. (In re Fountain)*, 612 B.R. 743, 748 (9th Cir. BAP 2020) ("[W]here a good faith objection to eligibility has been filed by a party in interest, the bankruptcy court can make a limited inquiry outside of the schedules to determine if the Debtor estimated her debts in good faith, and if not, whether she was eligible for chapter 13 relief."). "[E]ligibility under § 109(e) is determined as of the petition date, and is not based on post-petition events." *In re Fountain*, 612 B.R. at 748 (citations omitted).

In this case, there was no allegation that the Debtors did not file their schedules in good faith, so Mission Hen urges that the inquiry should cease there, and the bankruptcy court may only rely on the debt amounts listed in the Debtors' schedules. If we accept Mission Hen's position, then the Debtors' unsecured debt reported in their schedules exceeds the $419,275 limit for unsecured debt:

| | |
|---|---|
| $373,180.67 | Mission Hen unsecured portion |
| $21,030.39 | Stonetree Manor Community lien |
| $11,060.08 | Woodbury Community Ass'n lien |
| +$83,185.04 | other unsecured debt |
| $488,456.18 | total unsecured debt |

However, we doubt that *Scovis* intended such inflexibility. It held that § 109(e) "eligibility should **normally** be determined by the debtor's originally filed schedules, checking only to see if the schedules were made in good faith." 249 F.3d at 982 (emphasis added). The inclusion of

22

"normally" as a qualifier indicates that the Ninth Circuit foresaw instances where, irrespective of good faith, the eligibility analysis can sometimes involve more than just the face of the debtors' schedules.

This case has a feature that is not "normal." In most cases, the question of eligibility is raised early in the case. In that context, it makes sense to allow the court to rely on the debtors' schedules filed in good faith, so the court can dispose of the eligibility question quickly, before the parties have expended much time, effort, or money on the case. In this case, however, Mission Hen did not raise the eligibility issue until after the bankruptcy court held an evidentiary hearing and decided the true value of the Property. Mission Hen's theory would force the bankruptcy court to evaluate eligibility while completely ignoring all of the work that it and the parties had done to value the Property. In this procedural setting, it would be absurd to require the court to consider only the earlier-filed schedules and disregard its own finding of value.[7]

We emphasize that we see no indication that the Debtors filed their schedules in bad faith or attempted to manipulate their schedules to create

---

[7] We also note that eligibility under § 109(e) is not jurisdictional and can be waived. *FDIC v. Wenberg (In re Wenberg)*, 94 B.R. 631, 636 (9th Cir. BAP 1988) (holding that "§ 109(e) eligibility is not jurisdictional in nature"), *aff'd*, 902 F.2d 768 (9th Cir. 1990). Mission Hen did not object to the Debtors' eligibility until the second amended plan, long after the bankruptcy court had held an evidentiary hearing on the Valuation Motion, determined the value of the Property, and fixed the secured and unsecured portions of Mission Hen's claim. The bankruptcy court could have held that Mission Hen's inexplicable delay amounted to a waiver of its eligibility argument.

eligibility where there is none. The Debtors' schedules showed the Debtors' ineligibility on their face. This statement was contrary to the Debtors' interest in obtaining relief under chapter 13. There is no suggestion that the Debtors were dishonest or were attempting to manipulate the bankruptcy system; to the contrary, it appears that their counsel simply made a mistake.

*Scovis* should not be applied mechanically when, as here, the Debtors filled out the schedules in good faith and mistakenly indicated that they are not eligible for chapter 13 relief, but the bankruptcy court subsequently determined, after a full evidentiary hearing and before anyone raised an eligibility challenge, that they were indeed eligible. The bankruptcy court did not err.

Accordingly, using the unsecured amount of the Mission Hen claim as determined by the Valuation Order, the Debtors' unsecured debts fall within the unsecured debt limit:

| | |
|---|---|
| $204,030.50 | Mission Hen unsecured portion |
| $21,030.39 | Stonetree Manor Community lien |
| $11,060.08 | Woodbury Community Ass'n lien |
| +$83,185.04 | other unsecured debt |
| $319,306.01 | total unsecured debt |

Therefore, the bankruptcy court did not err in holding that the Debtors were eligible for chapter 13 relief.

**C.     The bankruptcy court did not err in determining that the fourth amended plan was feasible.**

Finally, Mission Hen argues that the bankruptcy court erred in determining that the plan was feasible, because Ms. Chen's parents' contribution was not adequately supported. We discern no error.

Section 1325(a)(6) requires that, before confirming a plan, the bankruptcy court find that "the debtor will be able to make all payments under the plan and to comply with the plan[.]" "To demonstrate that their proposed plan is 'feasible,' Chapter 13 debtors have to show that their plan has a 'reasonable chance of success.'" *In re Mycek*, Case No. 5:12-CV-00369-JGB, 2013 WL 9994332, at *3 (C.D. Cal. Oct. 22, 2013) (quoting *In re Bassett*, 413 B.R. 778, 788 (Bankr. D. Mont. 2009)).

A feasibility determination "is a finding of fact, which we may not disturb on appeal unless it is clearly erroneous." *In re Gavia*, 24 B.R. 573, 574 (9th Cir. BAP 1982).

When considering the effect of a promised family contribution, there are no hard and fast standards. We have stated that, "[a]lthough family contributions may be considered in determining the feasibility of a plan, the court may require evidence of a 'firm commitment by the family member to make the contributions and a long and undisputed history of providing for the debtor.'" *Richards v. Marshack (In re Richards)*, BAP No. CC-21-1178-LTF, 2022 WL 884593, at *7 (9th Cir. BAP Mar. 24, 2022)

(quoting *In re Deutsch*, 529 B.R. 308, 312 (Bankr. C.D. Cal. 2015)[8]), *appeal docketed*, Case No. 22-60016 (9th Cir. June 15, 2022); *see also Pellegrino v. Boyajian (In re Pellegrino)*, 423 B.R. 586, 590 (1st Cir. BAP 2010) ("Typically, courts include contributions where the contributor commits to contributing monthly for the life of the plan, and has demonstrated a willingness and ability to do so." (citations omitted)).

We defer to the bankruptcy court's findings concerning the plan's feasibility. The bankruptcy court considered the proposed parental

---

[8] In *Deutsch*, the bankruptcy court stated that "[t]he question of feasibility is fact-specific and dependent upon evidence submitted by the debtor. Evidence that would support the feasibility of nondebtor contributions includes evidence as to the ability, motivation, and unqualified commitment of the nondebtor to make the contributions." 529 B.R. at 312 (citation omitted). The bankruptcy court surveyed cases and identified "several factors . . . as commonly considered in determining the feasibility of chapter 13 plans involving contribution payments from nondebtors." *Id.* Those factors are:

> (1) the nondebtor's relationship to the debtor and motivation in making the contributions;
>
> (2) the nondebtor's long and undisputed history of making the contributions or otherwise providing support for the debtor;
>
> (3) the unqualified commitment of the nondebtor to make the contributions in a specific amount for the duration of the chapter 13 plan; and
>
> (4) the financial ability of the nondebtor to make the proposed contributions, including expenses and liabilities of the nondebtor that might take precedence over the contributions.

*Id.* at 313.

Mission Hen implies that the bankruptcy court erred by not explicitly considering each of these factors. It does not cite any authority that the court must always consider any or all of these factors or give these factors equal weight.

contribution and the details provided in Linda Chen's declaration. These included her uncontradicted statements that she and her husband had moved in with the Debtors and paid rent for nearly a year and that she and her husband had hundreds of thousands of dollars with which to protect the home that the family shared. Although it noted that the declaration was "not great," it nevertheless found that it was "enough to satisfy the feasibility." We will not second guess the bankruptcy court's factual finding.[9]

Mission Hen also argues that, even if allowing the parental contribution was appropriate, the Debtors' net monthly income was insufficient to cover the plan payments beginning in the tenth month of the plan. Again, the bankruptcy court considered this argument but nevertheless found the plan feasible. The bankruptcy court must have implicitly found that Ms. Chen's parents could and would increase their contributions as necessary to cover the monthly plan payments; that finding was reasonable in light of the large amount of cash that the parents controlled.

Accordingly, the bankruptcy court did not clearly err in determining that the plan was feasible.

---

[9] Mission Hen argues on appeal that it raised evidentiary objections to Linda Chen's declaration in its objection to the third amended plan. But while Mission Hen generally complained that the declaration did not establish all of the *Deutsch* factors, it did not raise or separately file any specific evidentiary objection to the admissibility of the declaration. *See* Local Bankruptcy Rule 9013-1(i)(2).

**CONCLUSION**

The bankruptcy court did not abuse its discretion in confirming the Debtors' chapter 13 plan. We AFFIRM.